**LAW OFFICES OF STUART E. FAGAN**
STUART E. FAGAN, State Bar No. 152732
P.O. Box 503741
San Diego, California 92150-3741
Telephone: (858) 220-9601
Facsimile: (858) 676-5339
Email: fairhousinglawyer@sbcglobal.net

Attorneys for Plaintiffs Seth Neri, Carolynn Neri,
Z.N., J.N., and L.N.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SETH NERI; CAROLYNN NERI; Z.N., J.N., and L.N., minors, by and through their Guardian Ad Litem, CAROLYNN NERI,<br><br>Plaintiffs,<br><br>v.<br><br>THE TENNIS VILLAS AT BLACKHAWK ASSOCIATION, INC.; and ALVAND, INC., d.b.a., COMMUNITY ASSOCIATION MANAGEMENT,<br><br>Defendants. | No. 4:13-CV-05180-KAW<br><br>COMPLAINT FOR MONETARY, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR TRIAL BY JURY |

**I.**

**INTRODUCTION**

1. This action seeks monetary, declaratory, and injunctive relief against defendants, the owners and operators of the Tennis Villas at Blackhawk Homeowners' Association in-------, California, for engaging in housing practices with the purpose or

effect of discriminating against plaintiffs and others based on familial status in violation of the federal Fair Housing Act, the California Fair Employment and Housing Act, and related state laws.

## II.
## JURISDICTION

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1331 in that the claims alleged herein arise under the laws of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 to hear and determine Plaintiffs' state law claims because those claims are related to Plaintiffs' federal law claims and arise out of a common nucleus of related facts. Plaintiffs' state law claims are related to Plaintiffs' federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

## III.
## INTRADISTRICT ASSIGNMENT

3. Venue is proper in the San Francisco or Oakland Division in that a substantial part of the events or omissions which give rise to the claims alleged herein occurred within the City of ---------, Contra Costa County, California.

## IV.
## PARTIES

4. Plaintiffs Seth Neri and Carolynn Neri are adults who reside in -------, California, with their minor children plaintiffs Z.N., J.N., and L.N. Plaintiff Seth Neri

is a police officer for the City of --------, and a former United States Marine.

5. Plaintiffs brings this action on behalf of themselves pursuant to the California Unfair Business Practices Act, California Business & Professions Code Sec. 17204.

6. Defendant The Tennis Villas at Blackhawk, Inc. (hereinafter, the "HOA"), is a California corporation located in Pleasanton, California, and was at all relevant times the owner and operator of the homeowners association for the Tennis Villas at Blackhawk Association (the "Development"). The Development consists of 30 single-family homes, which are located in --------, California, in a gated community. Plaintiffs' home is located within the Development. The Development is governed by a board of directors (the "Board").

7. At all relevant times, the HOA employed defendant Alvand, Inc., d.b.a., Community Association Management (hereinafter, "Community Association Management"), to assist in the management and operation of the Development.

8. Defendant Community Association Management, is, and at all times herein relevant was, the property manager of the Development and the agents, employees, or representatives of defendant HOA, in doing the acts or in omitting to act as alleged in this complaint, was acting within the course and scope of its actual or apparent authority pursuant to such agency or employment; or the alleged acts or omissions of it as agents or employees were subsequently ratified and adopted by defendant HOA as principal.

9. Julie Woulfe, Robin Leach, and Ralph Severe are, and at all times herein relevant were, members of the HOA Board, and the agents, employees, or representatives of defendants; in doing the acts or in omitting to act as alleged in this complaint, were acting within the course and scope of their actual or apparent authority pursuant to such agency or employment; or the alleged acts or omissions of them as agents or employees was subsequently ratified and adopted by defendants as principals.

10. JoAnn Loitz and Ed Etemad are, and at all relevant times were, employees of defendant Community Association Management, and are the agents, employees, or representatives of defendants; in doing the acts or in omitting to act as alleged in this complaint, were acting within the course and scope of their actual or apparent authority pursuant to such agency or employment; or the alleged acts or omissions of them as agents or employees were subsequently ratified and adopted by defendants as principals. Ms. Loitz, moreover, is, and at all relevant times was, the community manager for the HOA.

11. Each defendant is sued herein individually and as doing business as The Tennis Villas at Blackhawk Association, Inc.

12. Each defendant is, and at all times herein relevant was, the agent, employee, or representative of each other defendant, in doing the acts or in omitting to act as alleged in this complaint, was acting within the course and scope of his or her actual or apparent authority pursuant to such agency; or the alleged acts or omissions of each defendant as agent were subsequently ratified and adopted by each defendant as principal.

## V.

## FACTS

13. Defendants, doing business as the HOA, acting individually and in concert with others, directly and through agents, have engaged in a pattern or practice of discrimination against families with children, including plaintiffs Seth Neri and Carolynn Neri, and their minor children, on account of familial status in the operation of the Development. Defendants have engaged in this pattern or practice of discrimination with the purpose or effect of discriminating against plaintiffs and others based on familial status in violation of the federal Fair Housing Act, the California Fair Employment and Housing Act, and related state laws. Defendants' pattern or practice of discrimination includes, but is not limited to:

A. Discriminating in the terms, conditions, or privileges of sale of a dwelling, or in the provision of services or facilities in connection therewith, because of familial status;

B. Discouraging families with children from purchasing a dwelling within the Development;

C. Responding to families with children's requests for rule changes differently from adult-only household's requests for rule changes;

D. Forbidding children from playing in the common areas of the Development while permitting adults to engage in leisurely activity in the common areas;

E. Forbidding children from trick-or-treating for Halloween in the Development;

F. Discriminating on the basis of familial status; and

G. Making or causing to be made any statement with respect to the sale of a dwelling that indicates any preference, limitation, or discrimination based on familial

status.

14. In or around April 2012, plaintiff Seth Neri and Carolynn Neri purchased the single-family residence located at ----------------, California. The residence was, and is, located within the Development. Concurrently therewith, they were given a copy of the covenants, codes, and restrictions ("CC&Rs"), which contained the rules and regulations for the Development.

15. The CC&Rs contained the following rule: "In the common, open areas or streets, there is to be absolutely no skateboarding, rollerskating, ball playing or other games. Bicycling is restricted solely to ingress or egress."

16. When the Neris were moving into their home, they parked a rental moving truck in the driveway of their home, so that they could unload their furniture and personal belongings into their garage. Because their garage was being utilized for storage, Mr. Neri parked his unmarked police car in an open parking spot across from their house by the community pool. There were no "no parking" signs near the spot where he parked, and he believed it to be a guest parking spot. Unbeknownst to the Neris, the CC&Rs forbid parking on the streets from 2 a.m. to 6 a.m. Although Mr. Neri was not parked on the street, shortly thereafter the Neris received a written complaint from defendants about not parking any vehicles on the street. Mrs. Neri subsequently telephoned defendants to inform them that she had been unaware of the rule since they were just moving into their home. About one week later, defendants painted red the parking space where Mr. Neri had parked his unmarked police car.

17. Since April 2012, plaintiffs' neighbors have been permitted by defendants to park cars on the street in front of their house for weeks at a time with no

consequences. Plaintiffs' neighbors are adults who do not have children dwelling with them. As of October 2013, plaintiffs' neighbors are still parking their cars on the street in front of their house with no consequences. Plaintiffs have complained to defendants about the situation, but defendants have taken no action.

18. Since on or around October 1, 2013, and continuing through on or October 15, 2013, Board member Robin Leach parked her Lexus overnight on the street while construction was ongoing at her home.

19. A few days after receiving the no parking notice, the Neris received another notice from the defendants about allegedly attaching cardboard to their personal gate to their front door area. The Neris had done no such thing. Rather, the Neris merely had stacked some boxes near their front door area that they were flattening as they were unpacking them. The flattened boxes were removed in short order.

20. A few days after moving into the Development in April 2012, plaintiff Seth Neri was in the front of his home trimming a broken tree branch that was hitting the Neris' car and dripping sap onto it. Cynthia Akins, who was the wife of the president of the Board, drove by and saw Mr. Neri trimming the tree branch. As such, she stopped her vehicle and told him that he was not allowed to touch the trees. Mr. Neri informed her that he thought that since the tree was in front of his house that it was his responsibility to trim the tree. Ms. Akins informed Mr. Neri that the grass on which he was standing belonged to the HOA and that he needed permission to touch the tree branch, for it too belonged to the HOA. When Mr. Neri told her that the branch had been hitting his car, she then told him that he needed to file a request for landscaping. She told Mr. Neri that her husband was the president of the Board. Mrs. Akins, subsequently, was seen instructing her own gardener to trim bushes in front of her own

home that were part of the common areas of the Development.

21. Shortly thereafter, on or about July 11, 2012, the Neris received another notice from the HOA complaining about small solar lights that the Neris had put in the ground by their home. After receiving the notice, Mrs. Neri telephoned defendant Community Association Management and spoke to JoAnn Loitz about the notice. Mrs. Neri told Ms. Loitz that she felt like she was being targeted. The Neris, nonetheless, removed the small solar lights.

22. In or around October 2012, plaintiff Seth Neri was in his garage with his two boys excitedly getting out Halloween decorations. Board member Julie Woulfe walked in front of the Neris' home and saw them in the garage. She then told Mr. Neri that there was no trick-or-treating in the neighborhood and that they were not allowed to put out any holiday decorations whatsoever. Mr. Neri and the boys thus went back into their home and did not put up any Halloween decorations, nor did they attempt to go trick-or-treating in their neighborhood. Thereafter, plaintiff Carolynn Neri telephoned defendant Community Association Management and spoke to JoAnn Loitz to confirm Ms. Woulfe's statements about there being no trick-or-treating allowed in the neighborhood. Ms. Loitz confirmed that there was no trick-or-treating allowed in the neighborhood and stated that it was not allowed due to the "no soliciting" rule. The boys were very saddened by the fact that they were not allowed to decorate their home for the holiday or go trick-or-treating in their new neighborhood.

23. In or around December 2012, a neighbor who was a former member of the Board informed the Neris that they were not allowed to hang Christmas lights. As such, the Neris did not hang up any Christmas lights. Later, however, they hung some Christmas lights in the back of their home, for they simply wanted it to feel like

Christmas. The Neris' children were again saddened by not being able to openly decorate and celebrate Christmas in their own home.

24. From January 2013 to April 2013 the Neris openly played outside in the grass area in front of their home and read books on a blanket under the trees. The Neris do not have a front yard, and a deck serves as their backyard. The Neris live three houses from the entry gate to the Development, so they can clearly see if a car is coming through the electronic, remote-controlled entry gate.

25. In April 2013, the Neris went to church and heard an inspiring message from their children's youth pastor. He encouraged the church to get outside to get to know their neighbors, to share homegrown vegetables, to exchange holiday baked goods, and to simply sit on their porches to wave hello to their neighbors. After the service, the Neris' children wanted to immediately put the message into practice, so they sat outside their home and waved hello to their neighbors. Although some neighbors waved back, many neighbors appeared angry at the Neris' children for acting so kindly. The Neris and their children continued this practice a few more times, not realizing that there was a rule in place that forbid playing in the common areas (the "No Playing Rule").

26. On or about April 23, 2013, a regularly scheduled meeting of the HOA took place. During the new business portion of the meeting, the Board reviewed the material provided by defendant Community Association Management regarding signage and guidelines for enforcement of the skateboard, ball playing, and parking violations in the community. In its corporate minutes, the Board noted that it would notify the management company of any such violations.

27. In or around May 2013, defendants threatened the Neris with fines if their children didn't cease playing outside. Defendants further threatened that if the children continued playing outside, then a lien would be placed on the Neris' home.

28. On or about May 13, 2013, plaintiff Carolynn Neri received a copy of the minutes from the Board meeting that was conducted on April 23, 2013. After reading that the Board intended to erect "no playing" signs, she called defendant Community Association Management and left a voicemail message for JoAnn Loitz asking her to call her. Later that day, Ms. Loitz returned Mrs. Neri's telephone call. Mrs. Neri thus asked her why a "no playing" sign would be put up, and Ms. Loitz very rudely said it was a rule and that Mrs. Neri was "wrong." Ms. Loitz then stated that she assumed that Mrs. Neri was calling about the complaint made about the Neri's children playing outside in April, for that was reason the Board had decided to consider installing the "no playing" sign in the first place. Mrs. Neri had been completely unaware of the complaint, and told her that she had never received any such complaint from the defendants. As such, Ms. Loitz read it to her. Mrs. Neri was shocked and angered by the purported complaint, and she asked that she be sent a copy of the letter. She told Ms. Loitz that it wasn't legal and that they were the only family who had children living in the community. Ms. Loitz said the rules forbidding playing (i.e., the No Playing Rule) were legal and Mrs. Neri was wrong. "Nowhere does it say 'children' are not allowed to play. As long as wording says 'residents' it is legal" Ms. Loitz said to Mrs. Neri. Mrs. Neri said that the rule indirectly singled out children and said that she believed that the complaint seemed discriminatory, and that she would not stop her children from playing outside. Ms. Loitz told Mrs. Neri that if she did not stop her children from playing outside that she would be fined and a lien would be placed on their home. Ms. Loitz told her that she would need to attend the next Board meeting if she wanted the rule to be changed. She sated that it would be noted in the next

meeting's notes and then the community would have to vote to change the rule. Mrs. Neri said that she would contact a lawyer, and Ms. Loitz, in an apparent attempt to intimidate her, said that the "HOA has money and is very powerful." Finally, Ms. Loitz told Mrs. Neri that it would be cheaper for her to look for a kid-friendly place than to sue because lawsuits are very expensive and our board is very powerful."

29. After the conversation with Ms. Loitz, the Neris informed their children what was happening and told them that, for now, they would not be able to play outside. Mr. Neri explained that he did not feel comfortable playing outside and that he didn't want to cause any tension in their community since he already had a high stress job and wanted to just come home and relax and enjoy time with the children. The children were sad and felt that they were not welcome or safe in their own neighborhood. Mr. and Mrs. Neri, likewise, were saddened by not being able to play with their children in front of their own home. Subsequently, when the Neri children arrived home from school, they would become anxious merely standing on the sidewalk in front of their home, for fear that they were going to get in further trouble.

30. On or about May 26, 2013, plaintiff Carolynn Neri could not sleep and she woke up very anxious. It was a Sunday, and she went to church with her family. But before the service was over, Mrs. Neri's heart was rapidly beating, so she left church early to go to an urgent care facility. She was placed on medication, which she took for approximately four months until she found alternative ways to lower her blood pressure.

31. On or about May 27, 2013, plaintiffs Z.N. told Mrs. Neri that he would like to write a letter to all the neighbors to introduce themselves and ask the neighbors to remember what it was like to be kids in hopes of getting them to change the No Playing Rule. Mrs. Neri thought it sounded like a good idea, so plaintiffs Z.N. and J.N. wrote

and distributed a letter introducing themselves and asking all the homeowners to consider changing the rule that forbid them from playing outside of their own home (i.e., the No Playing Rule). They asked that the homeowners show up at the June 25th Board meeting and ask that the rule be changed by the Board.

32. On or about May 28, 2013, one of the letters that the Neris' boys had sent out was returned to their mailbox and marked: "No Move!!"

33. On or about May 29, 2013, another one of the letters that the Neris' boys had sent out was returned to their mailbox and marked: "No Way!" Move!" When Mrs. Neri saw the second, returned letter, she promptly walked up to Robin Leach, who was the acting president of the Board, to show her what she received in her mailbox. Mrs. Neri told her that they were getting harassed and that the rule needed to be changed. She told Mrs. Neri that she liked the letter that her boys had written, and she liked seeing the kids play, but it wasn't best for the neighborhood. She also told Mrs. Neri that some of the people in the community were upset that they were a mixed-race couple and that there were some "red necks" in the community who were not happy that the Neri family had moved in. She identified one of those individuals to be Board member Ralph Severe and the other to be the husband of the real estate agent who sold the house to the Neris. Mrs. Neri immediately began having a panic/anxiety attack. She had trouble breathing and had to go lie down to recover. Mrs. Leach's husband is one of the residents who stares at the Neris' children when they are outside. The Leaches live on the corner of the court as it curves, so they can see the Neris' house from their driveway.

34. On or about May 29, 2013, after receiving the second returned letter, Mrs. Neri was frightened by the tone of the two returned letters, so she called the Contra

Costa County Sheriff to complain.

35. On or around May 30, 2013, plaintiff J.N. no longer felt comfortable sleeping in his bedroom, for it faced the street where the children were not allowed to play. As such, he moved out of his bedroom and slept in his parents room from May through July 2013. Plaintiff J.N. was so distraught by the events that he daily would ask his parents if the No Playing Rule had been changed.

36. On or about May 29, 2013, Board member Julie Woulfe was walking by the Neris' house and saw Mrs. Neri cleaning in the garage. As such, Ms. Woulfe stopped in front of the Neris' home and just stared at Mrs. Neri. Finally, Ms. Woulfe stated to Mrs. Neri that she thought her boys were "rude" for having sent out their letter to all the residents and told Mrs. Neri to "get control of them." Ms. Woulfe then said that she had moved into the community because she already had raised her children and that she didn't like kids playing outside. Ms. Woulfe went on to say that most of the people living in the community had been there for many years and that the rule would not change because it was the best thing for the majority. Mrs. Neri told her that it was time to change the rule, for it was not best for the neighborhood. Mrs. Neri told her that other families with children would move into the community in time, for it was not a senior living area. Ms. Woulfe then said, "Well it hasn't changed for over 30 years. This was supposed to be for senior living." She then left abruptly.

37. On or about May 30, 2013, Mrs. Neri called defendant Community Association Management and spoke to JoAnn Loitz. Mrs. Neri told her what had happened with Ms. Woulfe and about the returned letters. "Well, you asked for it when you placed that in their mailboxes!" rudely responded Ms. Loitz. Ms. Loitz went on to say that "this neighborhood is all older people that want their peace and quiet. You are

the only ones with young kids that live here, so you have to live with the majority's opinion." Mrs. Neri reminded her that the law was being broken, and Ms. Loitz to her that if she wanted to sue, then it would cost a ton of money. Ms. Loitz finally told her, "If you don't like it, then moving to a kid-friendly neighborhood may be your best option."

38. On or about June 25, 2013, plaintiff Carolynn Neri and her son, plaintiff Z.N., appeared at the next regularly-scheduled Board meeting, which happened to be the 2013 Annual Meeting of the Membership and Election of Directors for the HOA. During the homeowner forum, Mrs. Neri said that the No Playing Rules violated federal fair housing laws. As such, she requested that the Board immediately vote to change the rule. The Board refused to take a vote on the matter right then, but agreed to talk about the matter and have an answer soon. Thereafter, Board member Ralph Severe said that the community was supposed to be a "senior living area." He further said that he was one of the first residents to move into the community in 1978 and he wanted to keep it a "senior living area." One resident also repeatedly said in front of the Board that he did not want children living in the community, and Mr. Severe agreed with him. Mr. Severe even began to harass Mrs. Neri at the Board meeting when she was speaking during the owners' forum. Mr. Severe later told Mrs. Neri at the meeting that her real estate agent or the sellers' agent should have told her that it was not a "kid friendly" community. Others homeowners said during the meeting that they enjoyed seeing the Neris' children playing in the community and that they were very respectful children. Mr. Severe said that the neighborhood was supposed to be senior living, but the state denied it, but that they had been able to keep it that way anyway. He then said that they enacted the No Playing Rules a long time ago to deter families with children from moving in. Another resident stated that he was surprised the real estate agent who sold the Neris the house didn't tell them that it was not a "kid friendly" neighborhood. In the end, the Board

refused to immediately retract the No Playing Rules, even over Mrs. Neri's statement that she would pursue legal remedies if they failed to do so.

39. After the June 25, 2013, Board meeting, the Neris prohibited their children from playing outside until the Board could make its ruling, for they did not want to cause trouble. As a result, the boys were not allowed to play outside for all of July and August. The boys were very upset at not being allowed to play outside during that time.

40. In or around July, 2013, the Neris obtained a copy of the minutes of the June 25, 2013, Annual Membership Meeting and Election meeting. The minutes made no mention of the fact that Ms. Neri had made a request that the rule against children's play be changed. Instead, the minutes noted: "Homeowner expressed concern about the Association policy regarding children playing in the common areas." Furthermore, the June 25, 2013, Board meeting minutes indicated that "there were no homeowners' forum issues" discussed during the meeting and that there was no new business.

41. On or about September 3, 2013, Mrs. Neri contacted defendant Community Association Management and left a voicemail message for JoAnn Loitz asking what had been done about the No Playing Rule. A few days later, Ms. Loitz finally called Mrs. Neri and said, "What do you mean 'what has been done'? You didn't ask for a rule change. Mrs. Neri was surprised by what she said, for Ms. Loitz was the person who had told Mrs. Neri how to make a request for a rule change, and Ms. Loitz was at the Board meeting. Mrs. Neri reminded her that she had requested that the No Playing Rule be changed. Ms. Loitz then tried to claim that Mrs. Neri had only shown up to express her concern over the No Playing Rule, and that she had never requested that it be changed. Mrs. Neri felt that Ms. Loitz was showing bias toward the HOA, so when Ms.

Loitz asked Mrs. Neri to email her about the matter, Mrs. Neri let her know that she had been speaking with a lawyer about filing a lawsuit. Ms. Loitz then told her that the HOA was “very powerful” and that lawsuits “cost a lot of money.” Ms. Loitz further said that “the Board had the power to keep rules if that is the majority.” Mrs. Neri told her that rules are supposed to be changed if they violate the law. Ms. Loitz then claimed that the No Playing Rule did not violate the law since the word “children” was not specifically stated in the rule.

42. On or about September 3, 2013, the Neris received in their mailbox a notice of a community-wide block party being put on by the HOA. The notice stated that the party would be in the yards of #51 & #52 and court. In light of the fact defendants already had told the Neris that their children could not play outside, they informed the defendants that they would be unable to attend.

43. On or about September 5, 2013, Mrs. Neri called defendant Community Association Management to speak to JoAnn Loitz’s superior, Ed Etemad, for she felt that Ms. Loitz was not behaving in a neutral manner when handling Mrs. Neri’s concerns. After explaining the situation to Mr. Etemad, he stated that the No Playing Rules were legal and that Mrs. Neri was wrong.

44. On or about September 10, 2013, the plaintiff Carolynn Neri caused to be delivered to defendants a letter outlining defendants’ violations of applicable fair housing laws and calling upon defendants to retract the illegal rules and inform all the homeowners within the Development of the retraction. Defendants did neither and continue to enforce the illegal rules to this date.

45. In or around September 10, 2013, the Neris were asked to attend an informal meeting at Board member Julie Woulfe's home. Mrs. Neri was asked to come restate her concerns. What is more, defendant Community Association Management, through its employee JoAnn Loitz, told Mrs. Neri that she must attend the mediation or she would have no right to sue them. Mrs. Neri informed Ms. Loitz that the federal Fair Housing Act did not mandate that she attend the informal meeting at the Board member's house, and so she would not be attending. The meeting was scheduled to be held on September 19, 2013.

46. On or about September 11, 2013, plaintiffs Z.N. and J.N. were out in front of their home in the common areas playing with a Nerf ball. They were extremely anxious because of the No Playing Rule. While they were outside, the acting president of the Board saw them and began staring at them. The boys finally felt so uncomfortable by his actions that they ran into the garage to tell their mom, for she was cleaning out her car at the time. Mrs. Neri was discouraged and angered by the actions of the acting president.

47. On or about September 18, 2013, plaintiff J.N. had a friend stay over at the Neris' house. At one point, the friend asked if the boys wanted to go outside and play. "We can't; we are not allowed to play in our neighborhood," said plaintiff J.N. The comments saddened Mrs. Neri. And plaintiff J.N. was embarrassed at not being able to play in his own neighborhood.

48. On the day following the informal meeting at Board member Julie Woulfe's home, on or about September 20, 2013, the Neris received an anonymous note that stated: "Move!! Rules won't change." After receiving the note, the Neris' children became even more anxious about going outside at all.

49. In or around September 2013, defendants finally delivered to the Neris a "courtesy notice," which was purportedly prepared on April 4, 2013, and which was requested by Mrs. Neri several times beginning on or about May, 13, 2013. The notice was written on behalf of the Board by defendant Community Association Management's JoAnn Loitz, and declared, among other things: "It was recently noted that residents of your home were riding skateboards and bicycles in the street. Pursuant to the Rules of Tennis Villas at Blackhawk, #4, in the common area open areas or streets, there is to be absolutely no skateboarding [*sic*] rollerskating, ball playing or other games. Bicycling is restricted solely to ingress and egress. We respectfully request that you refrain from these activities in the future."

50. Defendants' rules are targeted against children generally, and preclude them from engaging in recreational activity. The rules effectively prohibit children from accessing the common areas of the complex. Furthermore, defendants' rules, although neutral on their face, have a disparate impact upon children, who are members of a protected class.

51. Adult residents of the Development are permitted to walk around the common areas for exercise and to socialize with one another. Children, however, are forbidden by the HOA from engaging in similar activities.

52. On or about October 3, 2013, plaintiffs noticed that a woman who owns a home near plaintiffs' home was displaying Halloween decorations on her gate. The woman is part of an adult-only home.

53. Because of these incidents, plaintiffs feel unable to host social events at their home that would include their friends who are minors.

54. Defendants have treated requests for rule changes from families with children differently from requests for rule changes from adults-only households. When the Neris followed the defendants' rules for requesting a change of the No Playing Rules, defendants never notified the residents that a resident had requested a rule to be changed and refused to place the matter to a vote.

55. Plaintiff J.N. suffers from attention deficit disorder and has been particularly affected by not being able to go outside and play.

## VI.
## INJURIES

56. By reason of defendants' discriminatory housing practices, plaintiffs have suffered violation of their civil rights, economic losses, emotional distress, including humiliation, mental anguish, depression, discouragement, anger, irritability, nervousness, sleep loss, and attendant bodily injury, including, but not limited to, stomach aches, head aches, anxiety attacks, and otherwise sustained injury. In addition, plaintiffs have suffered invasion of their private rights of ownership as a result of defendants' threats and rules, depriving them of the full use and enjoyment of their ownership. Accordingly, plaintiffs are entitled to compensatory damages.

57. In doing the acts of which plaintiffs complain, defendants and their agents intentionally or recklessly violated plaintiffs' federally protected rights. Accordingly, plaintiffs are entitled to punitive damages under federal law.

58. There now exists an actual controversy between the parties regarding defendants' duties under federal and state civil rights laws. Accordingly, plaintiffs are entitled to declaratory relief under federal and state law.

59. Unless enjoined, defendants and their agents or employees will continue to engage in the unlawful acts and the pattern or practice of discrimination described above. Plaintiffs have no adequate remedy at law. Plaintiffs are now suffering and will continue to suffer irreparable injury from defendants' acts and the pattern or practice of discrimination unless relief is provided by this Court. Accordingly, plaintiffs are entitled to injunctive relief under federal and state law.

## VII.
## FIRST CLAIM
## (Fair Housing Act)

60. Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this complaint.

61. Defendants injured plaintiff by committing discriminatory housing practices in violation of the Fair Housing Act, 42 U.S.C. §3601 *et seq*.

## SECOND CLAIM
## (California Fair Employment and Housing Act)

62. Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this complaint.

63. Defendants injured plaintiff by committing discriminatory housing practices in violation of the California Fair Employment and Housing Act, California Government Code §§12927 and 12955 *et seq*.

**THIRD CLAIM**

**(California Unruh Civil Rights Act)**

64. Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this complaint.

65. Defendants injured the plaintiffs in violation of the Unruh Civil Rights Act, California Civil Code §51 *et seq*. by discriminating against plaintiffs in the operation of the Tennis Villas at Blackhawk, a business establishment, because of familial status.

66. Pursuant to the Unruh Civil Rights Act, plaintiffs are entitled to statutory damages, among other remedies, of up to three times their actual damages as determined by the trier of fact, but no less than $4,000.00 for each violation by defendants.

**FOURTH CLAIM**

**(Unfair Business Practices)**

67. Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this complaint.

68. In acting as herein alleged, defendants have engaged in a pattern or practice of unlawful discrimination in the operation of the Tennis Villas at Blackhawk, a business establishment, and therefore have engaged in acts of unfair competition as the

same is defined in California Business & Professions Code §17204.

**FIFTH CLAIM**

**(Negligence)**

69. Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this complaint.

70. Defendants owed plaintiffs a duty to operate the Tennis Villas at Blackhawk in a manner that was free from unlawful discrimination on the basis of familial status. Defendants negligently violated that duty by discriminating based on familial status. Defendants' violation of that duty was the result of negligence, including, but not limited to:

A. Defendants' negligent failure to hire persons who were familiar with the requirements of state and federal fair housing rights laws;

B. Defendants' negligent failure to train its employees and itself regarding the requirements of state and federal fair housing rights laws;

C. Defendants' negligent failure to supervise its employees regarding compliance with the requirements of state and federal fair housing rights laws;

D. Defendants' negligent failure to follow standard, recognized rental practices of the community;

E. Defendants' negligent failure to exercise the ordinary and reasonable care and diligence required of a housing provider in the operation and management of the subject rental premises; and/or

F. Defendants' negligent failure to discipline or terminate employees who failed to comply with the requirements of state and federal fair housing rights laws.

71. Such negligence was a substantial factor in causing plaintiff's injuries. As a direct and proximate result of the aforementioned acts of defendants, plaintiff has suffered damages.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, plaintiffs Seth Neri, Carolynn Neri, Z.N., J.N., and L.N. pray for entry of judgment against defendants that:

1. Awards compensatory and punitive damages according to proof;

2. Declares that defendants have violated the provisions of the applicable federal and state fair housing laws;

3. Enjoins all unlawful practices complained about herein and imposes affirmative injunctive relief requiring defendants, their partners, agents, employees, assignees, and all persons acting in concert or participating with it, to take affirmative action to provide equal housing opportunities to all tenants and prospective tenants regardless of familial status;

4. Awards statutory damages to plaintiff pursuant to the Unruh Civil Rights Act;

5. Awards pre-judgment interest and post-judgment interest as provided for by law;

6. Awards costs of suit herein incurred, including reasonable attorneys' fees; and

7. Awards all such other and further relief as the Court may deem proper.

Dated: November 19, 2013

LAW OFFICES OF
STUART E. FAGAN

By: /s/ Stuart E. Fagan
Stuart E. Fagan
Attorneys for Plaintiffs

## VIII.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby request a trial by jury.

Dated: November 19, 2013

LAW OFFICES OF
STUART E. FAGAN

By: /s/ Stuart E. Fagan
Stuart E. Fagan
Attorneys for Plaintiffs