**LAW OFFICES OF STUART E. FAGAN**
STUART E. FAGAN, State Bar No. 152732
P.O. Box 503741
San Diego, California 92150-3741
Telephone: (858) 220-9601
Facsimile: (858) 676-5339
Email: fairhousinglawyer@sbcglobal.net

Attorneys for Plaintiffs Seth Neri, Carolynn Neri,
Z.N., J.N., and L.N.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SETH NERI; CAROLYNN NERI; Z.N., J.N., and L.N., minors, by and through their Guardian Ad Litem, CAROLYNN NERI, <br><br> Plaintiffs, <br><br> v. <br><br> THE TENNIS VILLAS AT BLACKHAWK ASSOCIATION, INC.; and ALVAND, INC., d.b.a., COMMUNITY ASSOCIATION MANAGEMENT, <br><br> Defendants. | No. 4:13-CV-05180-KAW <br><br> MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT STIPULATION TO APPROVE COMPROMISE OF MINORS' CLAIMS <br> _____ |

## I.

## INTRODUCTION

Plaintiff/Guardian Ad Litem Carolynn Neri respectfully submits the following

Memorandum of Points and Authorities in support of the Joint Stipulation to approve

the compromise of the claims of the Neris' children. Briefly stated, the Neris entered

into a legally enforceable settlement agreement with all defendants to settle alleged violations of the Fair Housing Act, 42 U.S.C. §3601 *et seq.*, and related state laws.

As proposed, each of the Neris' children shall receive $9,000.  None of the Neris' children required any medical or psychiatric treatment for the injuries they sustained. What is more, none of the Neris' children show any signs of ongoing stress.

By this joint stipulation, plaintiff-guardian ad litem Carolynn Neri asks the Court to approve the compromise of the minors' claims because the settlement is fair and reasonable in light of the facts of the case, the minor's specific claims, and recovery in similar cases.

## II.
## STATEMENT OF FACTS

Plaintiffs Seth and Carolynn Neri, and their three children, Z.N., J.N., and L.N., alleged that defendant The Tennis Villas at Blackhawk Association, Inc. (hereinafter the "Association") acting individually and in concert with others, directly and through agents, engaged in a pattern or practice of discrimination against families with children, including plaintiffs, in violation of the Federal Fair Housing Act and related state laws.[1]

In or around April 2012, plaintiffs Seth Neri and Carolynn Neri purchased a single-family residence located within the Development. Concurrently therewith, they were given a copy of the covenants, codes, and restrictions ("CC&Rs"), which

---

[1]First Amended Complaint ("FAC") at ¶13 [Doc. #11.]

2

contained the rules and regulations for the Development.[2]  The Development consists of 30 single-family homes and is governed by a board of directors (the "Board").

The CC&Rs contained the following rule: "In the common, open areas or streets, there is to be absolutely no skateboarding, rollerskating, ball playing or other games.  Bicycling is restricted solely to ingress or egress."[3]

In or around October 2012, plaintiff Seth Neri was in his garage with his two boys excitedly getting out Halloween decorations.  Board member Julie Woulfe walked in front of the Neris' home and saw them in the garage.  She then told Mr. Neri that there was no trick-or-treating in the neighborhood and that they were not allowed to put out any holiday decorations whatsoever.  Mr. Neri and the boys thus went back into their home and did not put up any Halloween decorations, nor did they attempt to go trick-or-treating in their neighborhood.  Thereafter, plaintiff Carolynn Neri telephoned defendant Alvand and spoke to JoAnn Loitz to confirm Ms. Woulfe's statements about there being no trick-or-treating allowed in the neighborhood.  Ms. Loitz confirmed that there was no trick-or-treating allowed in the neighborhood and stated that it was not allowed due to the "no soliciting" rule.  The boys were very saddened by the fact that they were not allowed to decorate their home for the holiday or go trick-or-treating in their new neighborhood.[4]

In or around December 2012, a neighbor who was a former member of the Board informed the Neris that they were not allowed to hang Christmas lights.  As such, the

---

[2]FAC at ¶14.

[3]FAC at ¶15 (hereinafter, the "No Playing Rule").

[4]FAC at ¶22.

1    Neris did not hang up any Christmas lights.  Later, however, they hung some Christmas

2    lights in the back of their home, for they simply wanted it to feel like Christmas.  The

3    Neris' children were again saddened by not being able to openly decorate and celebrate

4    Christmas in their own home.[5]

5

6        From January 2013 to April 2013 the Neris openly played outside in the grass

7    area in front of their home and read books on a blanket under the trees.  The Neris do

8    not have a front yard, and a deck serves as their backyard.  The Neris live three houses

9    from the entry gate to the Development, so they can clearly see if a car is coming

10   through the electronic, remote-controlled entry gate.  There are no houses across the

11   street from the Neris' home.[6]

12

13       In April 2013, the Neris went to church and heard an inspiring message from

14   their children's youth pastor.  He encouraged the church to get outside to get to know

15   their neighbors, to share homegrown vegetables, to exchange holiday baked goods, and

16   to simply sit on their porches to wave hello to their neighbors.  After the service, the

17   Neris' children wanted to immediately put the message into practice, so they sat outside

18   their home and waved hello to their neighbors.  Although some neighbors waved back,

19   many neighbors appeared angry at the Neris' children for acting so kindly.  The Neris

20   and their children continued this practice a few more times, not realizing that there was

21   a rule in place that forbid playing in the common areas (i.e., the No Playing Rule).[7]

22

23

24   _____

25       [5]FAC at ¶23.

26       [6]FAC at ¶24.

27       [7]FAC at ¶25.

28

In or around May 2013, defendants threatened the Neris with fines if their children didn't cease playing outside.  Defendants further threatened that if the children continued playing outside, then a lien would be placed on the Neris' home.[8]

On or about May 13, 2013, plaintiff Carolynn Neri received a copy of the minutes from a Board meeting that was conducted on April 23, 2013.  After reading that the Board intended to erect "no playing" signs, she called defendant Alvand and left a voicemail message for JoAnn Loitz asking her to call her.  Later that day, Ms. Loitz returned Mrs. Neri's telephone call.  Mrs. Neri thus asked her why a "no playing" sign would be put up, and Ms. Loitz very rudely said it was a rule and that Mrs. Neri was "wrong."  During this conversation, Ms. Loitz further said the rules forbidding playing (i.e., the No Playing Rule) were legal and Mrs. Neri was wrong.  "Nowhere does it say 'children' are not allowed to play.  As long as wording says 'residents' it is legal" Ms. Loitz said to Mrs. Neri. Mrs. Neri said that the rule indirectly singled out children and said that she believed that the complaint seemed discriminatory, and that she would not stop her children from playing outside.  Ms. Loitz told Mrs. Neri that if she did not stop her children from playing outside that she would be fined and a lien would be placed on their home.[9]

After the conversation with Ms. Loitz, the Neris informed their children what was happening and told them that, for now, they would not be able to play outside.  Mr. Neri explained that he did not feel comfortable playing outside and that he didn't want to cause any tension in their community since he already had a high stress job and wanted to just come home and relax and enjoy time with the children.  The children

---

[8]FAC at ¶27.

[9]FAC at ¶28.

were sad and felt that they were not welcome or safe in their own neighborhood.  Mr. and Mrs. Neri, likewise, were saddened by not being able to play with their children in front of their own home.  Subsequently, when the Neri children arrived home from school, they would become anxious merely standing on the sidewalk in front of their home, for fear that they were going to get in further trouble.[10]

On or about May 27, 2013, plaintiffs Z.N. told Mrs. Neri that he would like to write a letter to all the neighbors to introduce themselves and ask the neighbors to remember what it was like to be kids in hopes of getting them to change the No Playing Rule.  Mrs. Neri thought it sounded like a good idea, so plaintiffs Z.N. and J.N. wrote and distributed a letter introducing themselves and asking all the homeowners to consider changing the rule that forbid them from playing outside of their own home (i.e., the No Playing Rule).  They asked that the homeowners show up at the June 25th Board meeting and ask that the rule be changed by the Board.[11]

On or about May 28, 2013, one of the letters that the Neris' boys had sent out was returned to their mailbox and marked: "No  Move!!"[12]

On or about May 29, 2013, another one of the letters that the Neris' boys had sent out was returned to their mailbox and marked: "No Way!"  Move!"  When Mrs. Neri saw the second, returned letter, she promptly walked up to Robin Leach, who was the acting president of the Board, to show her what she received in her mailbox.  Mrs. Neri told her that they were getting harassed and that the rule needed to be changed. She told

---

[10]FAC at ¶29.

[11]FAC at ¶31.

[12]FAC at ¶32.

Mrs. Neri that she liked the letter that her boys had written, and she liked seeing the kids play, but it wasn't best for the neighborhood.[13]

On or about May 29, 2013, after receiving the second returned letter, Mrs. Neri was frightened by the tone of the two returned letters, so she called the Contra Costa County Sheriff to complain.[14]

On or around May 30, 2013, plaintiff J.N. no longer felt comfortable sleeping in his bedroom, for it faced the street where the children were not allowed to play. As such, he moved out of his bedroom and slept in his parents room from May through July 2013. Plaintiff J.N. was so distraught by the events that he daily would ask his parents if the No Playing Rule had been changed.[15]

On or about May 29, 2013, Board member Julie Woulfe was walking by the Neris' house and saw Mrs. Neri cleaning in the garage. As such, Ms. Woulfe stopped in front of the Neris' home and just stared at Mrs. Neri. Finally, Ms. Woulfe stated to Mrs. Neri that she thought her boys were "rude" for having sent out their letter to all the residents and told Mrs. Neri to "get control of them." Ms. Woulfe then said that she had moved into the community because she already had raised her children and that she didn't like kids playing outside. Ms. Woulfe went on to say that most of the people living in the community had been there for many years and that the rule would not change because it was the best thing for the majority. Mrs. Neri told her that it was time to change the rule, for it was not best for the neighborhood. Mrs. Neri told her that

---

[13]FAC at ¶33.

[14]FAC at ¶34.

[15]FAC at ¶35.

other families with children would move into the community in time, for it was not a senior living area.  Ms. Woulfe then said, "Well it hasn't changed for over 30 years.  This was supposed to be for senior living."  She then left abruptly.[16]

On or about May 30, 2013, Mrs. Neri called defendant Alvand and spoke to JoAnn Loitz.  Mrs. Neri told her what had happened with Ms. Woulfe and about the returned letters.  "Well, you asked for it when you placed that in their mailboxes!" rudely responded Ms. Loitz.  Ms. Loitz went on to say that "this neighborhood is all older people that want their peace and quiet.  You are the only ones with young kids that live here, so you have to live with the majority's opinion."  Mrs. Neri reminded her that the law was being broken, and Ms. Loitz to her that if she wanted to sue, then it would cost a ton of money.  Ms. Loitz finally told her, "If you don't like it, then moving to a kid-friendly neighborhood may be your best option."[17]

On or about June 25, 2013, plaintiff Carolynn Neri and her son, plaintiff Z.N., appeared at the next regularly-scheduled Board meeting, which happened to be the 2013 Annual Meeting of the Membership and Election of Directors for the HOA.  During the homeowner forum, Mrs. Neri said that the No Playing Rules violated federal fair housing laws.  As such, she requested that the Board immediately vote to change the rule.  The Board refused to take a vote on the matter right then, but agreed to talk about the matter and have an answer soon.  Thereafter, Board member Ralph Severe said that the community was supposed to be a "senior living area."  He further said that he was one of the first residents to move into the community in 1978 and he wanted to keep it a "senior living area."  One resident also repeatedly said in front of the Board

---

[16]FAC at ¶36.

[17]FAC at ¶37.

8

that he did not want children living in the community, and Mr. Severe agreed with him. Mr. Severe even began to harass Mrs. Neri at the Board meeting when she was speaking during the owners' forum.  Mr. Severe later told Mrs. Neri at the meeting that her real estate agent or the sellers' agent should have told her that it was not a "kid friendly" community.  Others homeowners said during the meeting that they enjoyed seeing the Neris' children playing in the community and that they were very respectful children.  Mr. Severe said that the neighborhood was supposed to be senior living, but the state denied it, but that they had been able to keep it that way anyway.  He then said that they enacted the No Playing Rules a long time ago to deter families with children from moving in.  Another resident stated that he was surprised the real estate agent who sold the Neris the house didn't tell them that it was not a "kid friendly" neighborhood. In the end, the Board refused to immediately retract the No Playing Rules, even over Mrs. Neri's statement that she would pursue legal remedies if they failed to do so.[18]

After the June 25, 2013, Board meeting, the Neris prohibited their children from playing outside until the Board could make its ruling, for they did not want to cause trouble.  As a result, the boys were not allowed to play outside for all of July and August.  The boys were very upset at not being allowed to play outside during that time.[19]

On or about September 11, 2013, plaintiffs Z.N. and J.N. were out in front of their home in the common areas playing with a Nerf ball.  They were extremely anxious because of the No Playing Rule.  While they were outside, the acting president of the Board saw them and began staring at them.  The boys finally felt so uncomfortable by

---

[18]FAC at ¶38.

[19]FAC at ¶39.

his actions that they ran into the garage to tell their mom, for she was cleaning out her car at the time.  Mrs. Neri was discouraged and angered by the actions of the acting president.[20]

On or about September 18, 2013, plaintiff J.N. had a friend stay over at the Neris' house.  At one point, the friend asked if the boys wanted to go outside and play.  "We can't; we are not allowed to play in our neighborhood," said plaintiff J.N.  The comments saddened Mrs. Neri.  And plaintiff J.N. was embarrassed at not being able to play in his own neighborhood.[21]

On the day following the informal meeting at Board member Julie Woulfe's home, on or about September 20, 2013, the Neris received an anonymous note that stated:  "Move!!  Rules won't change."  After receiving the note, the Neris' children became even more anxious about going outside at all.[22]

### III.
### PLAINTIFFS' ALLEGED INJURIES

The Neris suffered emotional distress and violation of their civil rights.[23]  None of the Neris' children required any medical or psychiatric treatment for the injuries they

---

[20]FAC at ¶46.

[21]FAC at ¶47.

[22]FAC at ¶48.

[23]FAC at ¶56.

1  sustained as a result of the discrimination.[24]  What is more, none of the Neris' children

2  show any signs of ongoing stress.[25] Moreover, by all accounts, the Neris' children are

3  normal, young children.[26]

4

5  **IV.**

6  **POINTS AND AUTHORITIES**

7

8  A.   **THE PROPOSED SETTLEMENT IS FAIR AND REASONABLE TO THE**

9  **MINORS IN LIGHT OF THE FACTS OF THE CASE, EACH MINOR'S**

10  **CLAIMS, AND TYPICAL RECOVERIES BY MINOR PLAINTIFFS IN**

11  **SIMILAR CASES**

12

13  In *Robidoux v. Rosengren,* 638 F.3d 1177 (9th Cir. 2011), the Ninth Circuit

14  established the guidelines for determining whether a settlement to a minor plaintiff is

15  reasonable.  The court held:

16

17  "Inconsistency can be avoided if district courts limit the scope of

18  their review to the question whether the net amount distributed to

19  each minor plaintiff in the settlement is fair and reasonable, in light

20  of the facts of the case, the minor's specific claim, and recovery in

21  similar cases." *Id.*

22

23  The *Robidoux* court also went on to hold:

24  ────────────────

25  [24]Carolynn Neri Decl. at ¶4.

26  [25]*Id.*

27  [26]*Id.*

28

11

"More importantly, the district court should evaluate the fairness of each minor plaintiff's net recovery without regard to the proportion of the total settlement value designated for adult co-plaintiffs or plaintiffs' counsel - whose interests the district court has no special duty to safeguard." *Id.*

Briefly stated, the Neris alleged that the defendants violated the federal Fair Housing Act and related state laws by discriminating on the basis of familial status in the operation of the Tennis Villas at Blackhawk.[27]

After a private mediation before the Court-appointed neutral, the parties were able to resolve plaintiffs' claims and entered into a confidential settlement agreement.[28] Under the terms of the proposed settlement, each of the Neris' children is to receive $9,000.

Furthermore, none of Neris' children required any medical or psychiatric treatment for the injuries they sustained.[29]  Finally, none of their children show any signs of ongoing stress.[30]  Consequently, the amount of the recovery provided to them is very reasonable.

---

[27]FAC at ¶¶1,9-13.

[28]Except as disclosure is required to effectuate the terms of the settlement, the terms of the settlement agreement are confidential.  Fagan Decl. at ¶2.

[29]Neri Decl. at ¶4.

[30]*Id.*

By way of comparison, on December 3, 2007, the Department of Housing and Urban Development ("HUD") reported in *Fair Housing News* that it had settled a substantially similar case involving seven families who alleged that the managers of an apartment complex subjected residents with children to stricter community rules than residents without children and/or retaliated against residents with children for exercising their fair housing rights.  The settlement, therein, called for the seven families (adults and children) to receive less than $12,000 per family.[31]  Herein, the children of Neri family alone have received a *net* recovery of $27,000, which is more than double the *entire families* received in the HUD case.  In short, the monetary payment to the minors, herein, is reasonable.

In March 2008, HUD announced a settlement in *Fair Housing News* involving a three-year old autistic child.  Therein, the management company refused to accommodate the special needs of the three-year old child, and, eventually, sought to evict the family.  In the end, the apartment owner and the management company agreed to pay the parents $40,000 to settle the matter.  The child did not receive any of the settlement funds.[32]  By contrast, the children, herein, are receiving $9,000 each.

---

[31]A copy of the Winter 2008 issue of Fair Housing News is attached to the declaration of Stuart E. Fagan as Exhibit No. 4.  The document also may be found online at http://disasterhousing.gov/offices/fheo/library/newsletter-wtr08.pdf.  The total monetary recovery secured by HUD was $170,000, with $83,000 going to the seven families; $15,000 going to a fund for any additional victims; and $72,000 going to the construction and operation of an after-school program for children who lived at the complex.  As with most settlements, the document, unfortunately, does not denote how much each child was receiving.  Be that as it may, the minors' share, herein, exceeds the monetary share of each of the entire families in the referenced HUD matter.

[32]A copy of the March 2008 issue of Fair Housing News is attached to the Supplemental Declaration of Stuart E. Fagan as Exhibit No. 1.  The document also may be found online at http://archives.hud.gov/news/2008/pr08-068.cfm (June 10, 2011).  In addition to the payment to the parents, the owner and the management company paid $2,500 to an autism group and $2,500 to a designated early childhood development center in the family's school district.

In another fair housing matter alleging familial status discrimination, *Housing Rights Center v. Rivera Townhomes*, Case No. CV 02-5163-PA (C.D. Cal. Feb. 2003), the plaintiffs (seven families) complained that defendants injured plaintiffs through a policy that limited the families' ability to spend time in the common areas at the complex.  A settlement was reached therein calling for each family to receive approximately $18,500; that figure, however, was a gross figure from which attorney's fees and costs were to be deducted.[33]  With a similar complaint herein, the Neris' children, alone, are receiving a *net* settlement of $27,000.

More recently, in *Fair Housing Council of Central California v. Ephesians Management & Holding, LLC,* Case No. 1:09-CV-0682-AWI-DLB (E.D. Cal. 2010), three families and a fair housing organization sued the landlord for, *viz*, issuing several threatening warning notices prohibiting children from playing outside and threatening violators with eviction.[34] One of the families left under threat of eviction because of alleged actions of her children.  Another of the mothers feared letting her children play outside because of the threats of eviction.  The magistrate judge recommended for approval a settlement that called for the minors therein to receive between $1,900-$2,850/each.

In another recent case, *Monroe v. Cowing Litton Properties, LLC,* Case No. 8:11-CV-0479-CJC-MLG (C.D. Cal. 12-5-2011), similar to the case at hand, management

---

[33]A copy of the consent decree entered in *Housing Rights Center v. Rivera Townhomes*, #CV 02-5163PA(C.D. Cal. Feb. 2003) is attached to the Declaration of Stuart E. Fagan as Exhibit No. 3.  It is unclear from the consent decree entered therein what the net result was to each family, for it does not spell out the amount of the attorney's fees and costs.

[34]A true and copy of the Findings and Recommendations Regarding Motion for Approval of Minors' Compromise is attached to the Declaration of Stuart E. Fagan.

prohibited tenant children from playing in the common areas at a complex.  Therein, the court approved of a minor's compromise for $3,500 per child who had been subjected to the housing discrimination.[35]

In the end, in light of the facts of the case, each minor's claims, and typical recoveries by minor plaintiffs in similar cases, the proposed settlement is fair and reasonable to the minor plaintiffs.

### IV.
### CONCLUSION

For the foregoing reasons, plaintiff/guardian ad litem Carolynn Neri respectfully requests that the Court approve the proposed compromise of the claims of her children, for it is fair and reasonable in light of the facts of the case, each minor's claims, and typical recoveries by minor plaintiffs in similar cases.

If the Court decides that a hearing is necessary, then plaintiff/guardian ad litem Carolynn Neri is available to attend.  Plaintiffs request, however, that the minors be excused from attending.

---

[35]A true and correct copy of the order is attached to the Declaration of Stuart E. Fagan.

1 | Dated: July 29, 2014                          LAW OFFICES OF
2 |                                               STUART E. FAGAN
3 |
4 |                                               By: /s/ Stuart E. Fagan
5 |                                                    Stuart E. Fagan
  |                                               Attorneys for Plaintiffs
6 |
7 |
8 |
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |